**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>MARVIN WOOTEN | No. 3:13-cr-18 (SRU) |

### ORDER

On February 27, 2013, Marvin Wooten pleaded guilty (pursuant to a plea agreement) to Count One of an indictment charging him with conspiracy to distribute and to possess with intent to distribute 280 grams or more of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and 846. *See* Indictment, Doc. No. 14; Plea Agreement, Doc. No. 66; Min. Entry, Doc. No. 67.[1] On May 22, 2013, I held a sentencing hearing and sentenced Wooten to the mandatory minimum 120 months' imprisonment and 60 months' supervised release. *See* Min. Entry, Doc. No. 124; Judgment, Doc. No. 147 (entered on June 19, 2013). Wooten, now 51 years old, is housed at the minimum-security satellite camp at McKean Federal Correctional Institution ("FCI McKean"). *See Find an Inmate*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Oct. 16, 2020). Wooten's scheduled release date is July 22, 2021. *See id.* And Wooten is eligible for release to a halfway house on January 26, 2021. *See* Wooten's 2d Supp. Mem. in Support of Renewed Mot. for Release ("Wooten's 2d Supp. Mem."), Doc. No. 624.

---

[1] The indictment also charged Wooten with one count of possession with intent to distribute 28 grams or more of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii). *See* Indictment, Doc. No. 14, at ¶ 14. However, Wooten did not plead guilty to that count, and the government dismissed it at Wooten's sentencing. *See* Motion to Dismiss Count 12 of the Indictment, Doc. No. 123; Min. Entry and Order, Doc. No. 124.
    The parties agreed that the quantity of crack cocaine involved in the offense that was reasonably foreseeable to Wooten was between 840 grams and 2.8 kilograms. *See* PSR, Doc. No. 99, at ¶ 5; Plea Agreement, Doc. No. 66, at 3–4.

On August 5, 2020, Wooten (through counsel) filed a motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A), as amended in 2018 by the First Step Act. *See* Mot. for Release, Doc. No. 618, at 1. Wooten argues that the following "extraordinary and compelling reasons" warrant his release: (a) the general threat posed by COVID-19 in prisons, (b) the incapacitation of Wooten's sister combined with his aging mother's "diminishing ability to care for her," (c) Wooten's rehabilitation, (d) the fact that Wooten would have already been released through the BOP's Residential Drug Abuse Treatment Program ("RDAP") had the government not removed him from the program to testify in a federal grand jury proceeding. *See* Wooten's Mem. of Law in Support of Mot. for Release ("Wooten's Mem. of Law"), Doc. No. 618-1, at 1. On August 11, 2020, the government filed an opposition. *See* Gov't Opp'n, Doc. No. 619. The government opposes Wooten's motion on the merits because Wooten has not alleged "that he has a particular medical condition that makes him especially vulnerable to COVID-19." *Id.* at 2. The government also noted that Wooten did not demonstrate administrative exhaustion and that Wooten's release plan was unclear. *See id.* at 1–2.

On August 12, I denied without prejudice Wooten's motion and directed that "[w]hen Wooten re-files his motion, he should include information regarding (1) his efforts to exhaust administrative remedies and (2) whether he plans to live with his family in Ohio or with his fiancé in Texas, as the government suggests." Order, Doc. No. 620. On September 3, 2020, Wooten filed a renewed motion for release. *See* Wooten's Renewed Mot. for Release, Doc. No. 621. In that motion, Wooten provided updates on the status of his administrative exhaustion and his release plan. *See id.* On September 9, 2020, the government filed a renewed opposition. *See* Gov't Renewed Opp'n, Doc. No. 622. On September 15, 2020, Wooten filed a supplemental memorandum in support of his renewed motion for release, in which Wooten further addressed

administrative exhaustion and reported that a U.S. Probation Officer in the Northern District of Ohio spoke with Wooten's mother and "completed a virtual inspection" of her home, which is where Wooten plans to reside.  Wooten's 1st Supp. Mem. in Support of Renewed Mot. for Release ("Wooten's 1st Supp. Mem."), Doc. No. 623.  On September 24, Wooten filed a second supplemental memorandum in support of his renewed motion for release, in which Wooten informed me that he will be eligible for release to a halfway house on January 26, 2021.  *See* Wooten's 2d Supp. Mem., Doc. No. 624.

For the following reasons, I **grant** Wooten's renewed motion for release, doc. no. 621.

### I.      Standard of Review

The First Step Act of 2018 (the "FSA") amended the language of section 3582(c)(1)(A). Before the FSA, only the Director of the Bureau of Prisons (the "BOP") could make a motion for the court to reduce a defendant's sentence based on extraordinary and compelling reasons.  It is widely acknowledged that the BOP fell short in its gatekeeper role and that, as a result, too few inmates were granted compassionate release.  *See, e.g.*, U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *The Federal Bureau of Prisons' Compassionate Release Program* i (April 2013), https://oig.justice.gov/reports/2013/e1306.pdf ("[W]e found that the existing BOP compassionate release program has been poorly managed and implemented inconsistently, likely resulting in eligible inmates not being considered for release and in terminally ill inmates dying before their requests were decided."); Shon Hopwood, *Second Looks & Second Chances*, 41 CARDOZO L. REV. 83, 105–06 (2019); William W. Berry III, *Extraordinary and Compelling: A Re-Examination of the Justifications for Compassionate Release*, 68 MD. L. REV. 850, 868 (2009) (noting that, in the 1990s, 0.01 percent of inmates annually were granted compassionate release).

Congress passed the FSA against that backdrop. The FSA altered section 3582(c)(1)(A), in part, to increase the use of compassionate release. *See* 164 Cong. Rec. H10358 (daily ed. Dec. 20, 2018) (titling changes to section 3582(c)(1)(A) as "Increasing the Use and Transparency of Compassionate Release"). In particular, the FSA amended section 3582(c)(1)(A) to allow a defendant him- or herself to bring a motion for compassionate release. Section 3582(c) now reads, in relevant part:

> (c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that – (1) in any case –
>
> > (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –
> >
> > > (i) extraordinary and compelling reasons warrant such a reduction; . . .
> >
> > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Until recently, I (and many other district courts around the country) interpreted the "applicable policy statement[] issued by the Sentencing Commission" to be U.S.S.G. § 1B1.13. *See, e.g.*, *United States v. Almontes*, 2020 WL 1812713, at *2 (D. Conn. Apr. 9, 2020). Section 1B1.13 reads, in relevant part:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable, the court determines that—
>
> (1)
> > **(A)** Extraordinary and compelling reasons warrant the reduction; or

4

    **(B)** The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

Two application notes to section 1B1.13 further elucidate the meaning of "extraordinary and compelling reasons." Application note three provides, simply, that rehabilitation of a defendant "is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13 cmt. n.3 (citing 28 U.S.C. § 994(t)). Application note one sets forth three specific examples of "extraordinary and compelling reasons" and also one catch-all provision. The first example explains that an inmate's medical condition rises to the level of an extraordinary and compelling reason when the inmate is suffering from a terminal illness or some other serious condition that "substantially diminishes" that inmate's ability to provide self-care within the prison. U.S.S.G. § 1B1.13 cmt. n.1(A). The second example regards defendants over the age of 65. *See* U.S.S.G. § 1B1.13 cmt. n.1(B). The third example concerns situations in which an inmate's family circumstances amount to "extraordinary and compelling reasons" warranting release:

    **(C) Family Circumstances**.—

        **(i)** The death or incapacitation of the caregiver of the defendant's minor child or minor children.

        **(ii)** The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

U.S.S.G. § 1B1.13 cmt. n.1(C). The catch-all provision, titled "Other Reasons," provides that extraordinary and compelling reasons also exist when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D).

Because the Sentencing Commission has not amended section 1B1.13 since Congress passed the FSA, some anachronisms within section 1B1.13 are in tension with the FSA. In particular, two clauses in section 1B1.13—including the catch-all provision at U.S.S.G. § 1B1.13 cmt. n.1(D)—still require that the Director of the BOP be the one to bring a motion for relief under section 3582(c)(1)(A). Of course, though, the FSA altered section 3582(c)(1)(A) directly and eliminated that requirement by allowing a defendant him- or herself to bring such a motion under certain circumstances. In part for that reason, the Second Circuit has recently held that section 1B1.13 is *not applicable* to compassionate release motions brought by defendants themselves. *See United States v. Brooker*, 2020 WL 5739712, at \*6 (2d Cir. Sept. 25, 2020). Because in this case Wooten himself made a motion for compassionate release, I may "consider the full slate of extraordinary and compelling reasons," and nothing in the "now-outdated version" of section 1B1.13 limits my discretion. *Id.* at \*7.

In granting motions for reductions in sentence under section 3582(c)(1)(A) that are based on the threat posed by COVID-19, courts within this circuit and across the country have concluded that "extraordinary and compelling" reasons for release exist when an incarcerated defendant suffers from health conditions or other infirmities that make him particularly susceptible to serious complications should he contract COVID-19. *See, e.g.*, *United States v. Colvin*, 451 F. Supp. 3d 237, 241 (D. Conn. 2020).

6

But courts have focused on other factors, too.  For instance, numerous courts have held that, during the COVID-19 pandemic, the impending end of an inmate's sentence helps constitute an "extraordinary and compelling" reason to grant an inmate's motion for compassionate release.  *See, e.g.*, *United States v. O'Neil*, 2020 WL 2892236, at *7 (S.D. Iowa June 2, 2020) (releasing prisoner with projected release date in 2023 who had served about 73 percent of his sentence); *United States v. Rivera*, 2020 WL 3186539, at *6 (D. Conn. June 15, 2020) (releasing inmate with about one year (ten percent) of his sentence remaining); *United States v. Jepsen*, 451 F. Supp. 3d 242, 246 (D. Conn. 2020); *United States v. Campagna*, 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020); *United States v. Perez*, 451 F. Supp. 3d 288, 294 (S.D.N.Y. 2020).  Given the threat of COVID-19, when a defendant has a small fraction of his sentence remaining, "[t]he benefits of keeping him in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave."  *Perez*, 451 F. Supp. 3d at 294.

In addition, some courts have held that a defendant's role as the only available caregiver for an incapacitated close family member can contribute to "extraordinary and compelling reasons" warranting that defendant's release.  Many courts—relying on a narrow construction of U.S.S.G. § 1B1.13 cmt. n.1(C)(ii)[2]—have held that "extraordinary and compelling reasons" exist only when a defendant is the only available caregiver for an incapacitated "spouse or registered partner."  *See, e.g.*, *United States v. Hunter*, 2020 WL 127711, at *3 (S.D. Ohio Jan. 10, 2020). However, some courts have held not held so narrowly and have found that "extraordinary and compelling reasons" may exist when a defendant is the only available caregiver of incapacitated

---

[2] As described above, U.S.S.G. § 1B1.13 cmt. n.1(C)(ii) provides that "extraordinary and compelling reasons exist" when the defendant "would be the only available caregiver" for the defendant's incapacitated "spouse or registered partner."

7

close family members *other than* spouses and registered partners—particularly, parents.  *See, e.g.*, *United States v. Bucci*, 409 F. Supp. 3d 1, 2–3 (D. Mass. 2019) (mother); *United States v. Walker*, 2019 WL 5268752, at *2–3 (N.D. Ohio Oct. 17, 2019) (mother); *United States v. Riley*, 2020 U.S. Dist. LEXIS 82909, at *6–7 (D. Vt. May 12, 2020) (father); *United States v. Hernandez*, 2020 WL 4343991, at *1 (S.D. Fla. Apr. 3, 2020) (mother); *United States v. Lisi*, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020) (mother, but declining to release defendant based on 3553(a) sentencing factors).[3]  Even more importantly, the above decisions all rely heavily on the language of section 1B1.13 cmt. n.1(C), but, given the Second Circuit's recent guidance, that section is inapplicable to the instant motion.  *See Brooker*, 2020 WL 5739712, at *6.  Thus, the decisions that limit "extraordinary and compelling reasons" to situations in which the defendant is the only available caregiver for an incapacitated spouse or registered partner are even less persuasive.

Courts also routinely focus on a defendant's rehabilitation as one (non-dispositive) factor contributing to "extraordinary and compelling reasons."  *See, e.g.*, *United States v. Rodriguez*, 2020 WL 5810161, at *4 (S.D.N.Y. Sept. 30, 2020) ("[W]hile rehabilitation alone is insufficient, it can interact with the present coronavirus pandemic to create an extraordinary and compelling reason for a sentence reduction.") (quoting *Brooker*, 2020 WL 5739712, at *9) (cleaned up); *United States v. Millan*, 2020 WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020); 28 U.S.C. § 994(t) (providing that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason").

---

[3] Admittedly, Wooten does not cite (and I am unaware of) any case in which a court has held that a defendant's status as the only available caregiver for his incapacitated sibling contributed to "extraordinary and compelling reasons" warranting that defendant's release.  But I see no principled reason to distinguish between a defendant's sister and a defendant's parent in that regard.  *Cf. Bucci*, 409 F. Supp. 3d at 2 (seeing no reason to distinguish between a defendant's spouse and a defendant's parent).

8

The defendant bears the burden of proving that he or she is entitled to a sentence reduction. *See United States v. Morales*, 2020 WL 2097630, at *2 (D. Conn. May 1, 2020). Courts "have broad discretion in deciding whether to grant or deny a motion for a sentence reduction." *United States v. Jones*, 2020 WL 2782395, at *2 (D. Conn. May 29, 2020) (quoting *United States v. Tagliaferri*, 2019 WL 6307494, at *3 (S.D.N.Y. Nov. 25, 2019)) (cleaned up). Indeed, section 3582(c)(1)(A) grants a district court permissive authority to reduce an inmate's sentence under certain conditions. *See* 18 U.S.C. § 3582(c)(1)(A) ("[T]he court . . . *may* reduce the term of imprisonment . . . .") (emphasis added).

## II. Discussion

### A. Background

Wooten was arrested on January 14, 2013, and he has remained incarcerated ever since. *See* PSR, Doc. No. 99, at ¶ 6. Neither party focuses much on Wooten's offense conduct in this case. Put simply, Wooten bought powder cocaine from sources in Connecticut and New York and himself cooked that powder cocaine into crack cocaine. *See id.* at ¶¶ 8–36. Wooten then distributed the crack cocaine to others for further distribution. *See id.* at ¶ 9. The government describes Wooten's conviction as the result of a "lengthy DEA investigation that established him as the center of a crack-distribution enterprise." Gov't Opp'n, Doc. No. 619, at 7. As the government also points out, Wooten had a rather troubling event in his criminal history:

> At the time of the offense, Mr. Wooten was less than a year off supervision by the State of Connecticut in connection with his manslaughter/attempted murder conviction for the 1993 shooting death of a seven year old child in Stamford, Connecticut. That senseless and violent act stemmed from a turf war involving drug sales in Stamford.

*Id.*; *see also* PSR, Doc. No. 99, at ¶ 55 (describing the manslaughter and attempted murder conviction).

9

For his conduct in this case, Wooten faced a ten-year mandatory minimum penalty, and his Guidelines range was 135-to-168 months' imprisonment. *See* PSR, Doc. No. 99, at ¶ 50 (total offense level 31); *id.* at ¶ 57 (criminal history category III); *id.* at ¶ 101–02. At the sentencing hearing in this matter, I explained why Wooten's conduct did not warrant, in my view, the 120 months' imprisonment that I was bound to impose. Several of my comments from that sentencing hearing are relevant for purposes of this motion.

On the one hand, I commented that Wooten had committed a "very serious crime," one "punishable by up to life in prison." Sentencing Hr'g Tr., Ex. D to Mot. for Release ("Sentencing Tr."), Doc. No. 618-5, at 17:12–14. I also noted that Wooten's "criminal background is serious" and includes "prior convictions for both violent acts and for drug related acts." *Id.* at 17:18–20. But I explained that the different treatment of powder and crack cocaine under the Guidelines resulted in an unjustifiably high Guidelines range in this case. *See id.* at 17:22–18:6. I explained that I would depart from the Guidelines range pursuant to *Kimbrough v. United States*, 552 U.S. 85 (2007), and thus adopt a one-to-one powder-to-crack ratio. *See id.* at 18:7–16; 21:22–22:1.[4] With that understanding, Wooten's Guidelines range would have been 70-to-87 months' imprisonment. *See id.* at 18:15.

I remarked that—had Wooten's Guidelines range called for 70-to-87 months' imprisonment—I would have sentenced Wooten "above that range because of your background, because of your age, the fact that you've had a chance to grow up, to be in a serious relationship,

---

[4] I even remarked that a one-to-one ratio may have been too harsh. *See* Sentencing Tr., Doc. No. 618-5, at 19:23–20:5 ("[Y]ou were taking powder cocaine and you were the one who knew how to cook it up, and you were cooking it up and, ironically, you were adding to the weight of the drug by cooking it, so you were increasing your guideline range every time you did that. So even the one-to-one ratio in one sense does not accurately account for the difference in these two drugs.").

10

to have a young child," and because Wooten had chosen to engage in drug dealing rather than to take advantage of legitimate employment opportunities.  *Id.* at 18:16–19:4.

However, I also made clear that, had there been no applicable mandatory minimum in this case, I would have sentenced Wooten to less than 120 months' imprisonment.  I remarked that Wooten's reaction to being arrested in this case—he was the first of 14 co-defendants to plead guilty, and he did so very quickly, taking full responsibility for his actions[5]—encouraged me.  *See id.* at 19:4–9.  I noted that "there's no hint of violence in your recent activities."  *Id.* at 19:11–12.  I also pointed out that—although the government characterized Wooten as a "leader" of the instant drug conspiracy—I did not view Wooten as "a leader in the traditional sense of having a drug organization."  *Id.* at 19:20–22.  I summed up:

> [T]he mandatory minimum here becomes the ultimate determinant of this sentence. If this had been a powder case, if you had been subject only to a five year mandatory minimum and a 70-to-87 month guideline range, I would have gone above that, but I'm unlikely to have gone as high as 120 months.  Your conduct here is serious but it's not serious enough to warrant the 120 months.

*Id.* at 21:25–22:7.  Finally, I expressed my hope that, upon his release, Wooten would not return to Connecticut because it was in Connecticut that Wooten had connections with people who were bad influences on him.  *See id.* at 21:7–21.

### B.  Parties' Arguments

Wooten argues that extraordinary and compelling reasons warrant his release.  Although Wooten does not claim that he suffers from any particular medical issue that makes him more susceptible to serious illness should he contract COVID-19, Wooten still relies in part on the general (and extraordinary) threat that COVID-19 poses in prisons.  *See* Wooten's Mem. of Law,

---

[5]  *See* PSR, Doc. No. 99, at ¶ 3; *see also* Wooten's Mem. of Law, Doc. No. 618-1, at 3 (noting that all thirteen other co-defendants subsequently followed in Wooten's footsteps and pleaded guilty).

Doc. No. 618-1, at 8–15.  Wooten acknowledges that there have been no positive tests thus far at FCI McKean; however, Wooten emphasizes that there still may be undetected positive cases at FCI McKean and that, if and when COVID-19 arrives, it will spread rapidly.  *See id.* at 13–15.  Wooten also argues that because he is Black he may be more likely to become infected (or to suffer serious complications) than someone who is white.  *See id.* at 15.

The core of Wooten's argument concerns his role as the "only available caregiver for his aging mother and disabled sister."  *Id.*  Wooten explains that his mother ("Mrs. Wooten") is 69 years old and lives in Akron, Ohio with Wooten's 48-year-old sister,[6] who has "suffered from cerebral palsy since birth and is confined to a wheelchair."  *Id.* (citing PSR, Doc. No. 99, at ¶ 63).  In a letter to me, Mrs. Wooten explains that Wooten's sister "is not capable of taking care of herself."  Mrs. Wooten's Letter, Ex. E to Wooten's Mot. for Release ("Mrs. Wooten's Letter"), Doc. No. 618-6, at 2.  Mrs. Wooten claims that in Ohio she "has no family to turn to for help," and that she herself has "medical issues."  *Id.*  Indeed, Mrs. Wooten explains that taking care of her now-50-year-old daughter "is increasingly difficult" because, for instance, Mrs. Wooten no longer drives.  Wooten's Renewed Mot. for Release, Doc. No. 621, at 1.  Before Wooten's incarceration, Wooten was the "only help" Mrs. Wooten had.  Mrs. Wooten's Letter, Doc. No. 618-6, at 2.  Mrs. Wooten explains that "it is difficult to go shopping etc. with my handicapped daughter and maintain her safety especially with the corona virus pandemic."  *Id.*  Mrs. Wooten claims that having Wooten home would be helpful because Wooten "would assist

---

[6] It appears that the individual whom Wooten calls his sister is actually his maternal *half*-sister.  *See* PSR, Doc. No. 99, at ¶ 63.  But that distinction hardly makes a difference to my consideration of this motion.  Wooten appears to be extremely close with his mother and half-sister.  At the time of the PSR, "Wooten maintain[ed] regular contact with his mother and maternal sister."  *Id.*  Indeed, Wooten described his mother as "his best friend."  *Id.* at ¶ 64.  Mrs. Wooten told the probation officer that Wooten "cares deeply for his disabled sister, Linda, and when he is home, he is active in assisting [Mrs. Wooten] with his sister's care."  *Id.* at ¶ 74.  Mrs. Wooten noted that "in the future, her son hopes to move away from Connecticut and start a new life for himself," and, at that time, she will stand "ready to assist him and noted she will need his help to continue caring for his disabled sister."  *Id.*

with transporting [Mrs. Wooten] and [his] sister to appointments" and with "physically lifting his sister and engaging, generally, in other aspects of caring for his sister." Wooten's Renewed Mot. for Release, Doc. No. 621, at 1. Wooten acknowledges that section 1B1.13's "family circumstances" prong "concerns only the incapacitation of a defendant's spouse, partner, or the caregiver of his minor children," but Wooten argues that "[r]elationships with a parent or sibling are sufficiently akin to those contemplated by the Guidelines to be similarly included." Wooten's Mem. of Law, Doc. No. 618-1, at 16.

Wooten argues that two other factors contribute to "extraordinary and compelling reasons" warranting his release. The first is Wooten's excellent rehabilitation. Wooten reports that he has been "incident-free, alcohol-free, and substance-free during his entire time in BOP." *Id.* at 17. Indeed, "Wooten has not received a single disciplinary ticket in the BOP." *Id.* Wooten "worked his way down from a low-security FCI to a minimum-security satellite camp, successfully completed the Drug Abuse Education Course with a score of 100%, and participated in numerous other educational programs, including a parenting class." *Id.*; *see also* BOP Progress Report, Ex. A to Wooten's Mot. for Release ("BOP Progress Report"), Doc. No. 618-2. The second is the fact that Wooten might have *already been released* had the government not removed him from RDAP after he had already completed over six months of the program. Wooten entered RDAP in October 2018, but the government had Wooten transferred away from FCI McKean for the following nine months so that Wooten could provide one day of federal grand jury testimony. *See* Wooten's Mem. of Law, Doc. No. 618-1, at 17. Although Wooten could have re-started the RDAP program again in December 2019, Wooten was "[u]nderstandably frustrated," and "declined to continue with RDAP" at that time. *Id.*

13

Finally, Wooten claims that reducing his sentence to time served would result in a sentence sufficient to serve the goals of sentencing, as described in 18 U.S.C. § 3553(a).  Wooten explains that he has already served the equivalent of 106 months' imprisonment (including good time credit).  *Id.* at 18.  Wooten points to his experience in RDAP, his rehabilitation, and his concrete release plan as factors weighing in his favor.  *See id.* at 19.  Wooten also argues that he "is unlikely to recidivate, given his current age, accomplishments in prison, and strong release plan."  *Id.* at 20.  Wooten notes that I should not hesitate to reduce his sentence even though it would result in a sentence below the mandatory minimum; numerous courts have done so when granting defendants' motions for sentence reductions under the First Step Act.  *See id.* (citing, *inter alia*, *United States v. Bess*, 455 F. Supp. 3d 53, 67 & n.11 (W.D.N.Y. 2020) (citing cases)).

The government takes a different view.  On the merits, the government claims that Wooten "has not met his burden of establishing that a sentence reduction is permitted" under 18 U.S.C. § 3582(c)(1)(A) because he relies on "the general threat posed by the COVID-19 pandemic and a host of other factors not related to any personal health concerns."  Gov't Opp'n, Doc. No. 619, at 1–2; 11–13.  The government details the BOP's extensive procedures to combat the potential spread of COVID-19 within its facilities.  *See id.* at 2–7.  The government focuses mostly on section 1B1.13—which it considers "binding" authority on my consideration of Wooten's motion—and how it "provides no basis for a sentence reduction based on concerns regarding the length of a previously imposed sentence or the factors now identified by Mr. Wooten."  *See id.* at 15–18.

    C. <u>I Will Reduce Wooten's Sentence To Time Served.</u>

        1. Exhaustion

Normally, a defendant may not bring a motion for compassionate release pursuant to section 3582(c)(1)(A) until "the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).  The parties agree that, as of September 14, 2020 at the latest, Wooten had satisfied the relevant exhaustion requirement.  *See* Gov't Renewed Opp'n, Doc. No. 622, at 1; Warden's Letter, Ex. C to Wooten's 1st Supp. Mem., Doc. No. 623-1, at 2; Warden's Letter, Ex. B to Wooten's Renewed Mot. for Release., Doc. No. 621-1 at 5.  Thus, Wooten has exhausted his administrative remedies.

   2. Extraordinary and Compelling Reasons

Although no single factor in Wooten's case amounts to an "extraordinary and compelling reason" warranting his release, I hold that several factors combine to form such a reason in this case.  *Cf. Almontes*, 2020 WL 1812713, at *5 (holding that, although no single factor warranted release, "a combination of factors add up to extraordinary and compelling reasons").  The most important factor is Wooten's status as the only available caregiver for his aging mother and disabled sister in Ohio.  I have already explained why I disagree with the government's position that "extraordinary and compelling reasons" based on an inmate's family circumstances exist only when an inmate is the only available caregiver for an incapacitated spouse or registered partner.  Thus, I agree with courts that have held that extraordinary and compelling reasons can exist when an inmate is the only available caregiver for a close family member other than a spouse or registered partner, such as a parent—or, as here, a sibling.  *See Bucci*, 409 F. Supp. 3d at 2–3; *Walker*, 2019 WL 5268752, at *2–3; *Riley*, 2020 U.S. Dist. LEXIS 82909, at *7; *Hernandez*, 2020 WL 4343991, at *1; *Lisi*, 440 F. Supp. 3d at 252.

However, in my view, Wooten's status vis-à-vis his sister does not, alone, amount to an extraordinary and compelling reason warranting Wooten's release. That is because he is not technically her only available caregiver. Mrs. Wooten's letter to me makes clear that—although it is difficult and getting more difficult all the time—she still cares for Wooten's sister. Thus, I must look elsewhere for additional reasons warranting Wooten's release.

The other factors that Wooten identifies are less significant, but they are nonetheless substantial. One important factor is Wooten's rehabilitation. As described above, Wooten's rehabilitation has been total. It is an impressive feat not to have amassed a single disciplinary ticket in nearly a decade of incarceration. In addition, Wooten has worked hard to improve himself while in prison. As the BOP itself reports: "Wooten should be fully employable upon release from confinement." BOP Progress Report, Doc. No. 618-2, at 3.[7]

Another important consideration is the fact that Wooten is quite near the end of his sentence. Indeed, he is scheduled to be released to a halfway house in January 2021 (three months from now) and to be released from custody entirely in July 2021 (10 months from now). Thus, Wooten has served about 90 percent of his sentence. In considering inmates' motions for compassionate release during the COVID-19 pandemic, numerous courts have noted that it is particularly appropriate to grant such motions when the inmate is near the end of his sentence because "[t]he benefits of keeping him in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave." *Perez*, 451 F. Supp. 3d at 294. Indeed, I have already indicated that I agree with that reasoning. *See United States v. Woodward*, No. 3:11-cr-177, Order, Doc. No. 35, at 9–10. In this case, the fact that Wooten is

---

[7] Wooten's father, who apparently lives in Connecticut, is a semi-retired carpenter who has informed me that he is willing to "teach Marvin the carpentry trade and train him to become a contractor like me if he has a need for employment and income." C. Entzminger Letter, Ex. C to Wooten's Renewed Mot. for Release, Doc. No. 621-1, at 7.

near the end of his sentence takes on added significance because I expressed my view at Wooten's sentencing that, were it not for the applicable 120-month mandatory minimum, I would have sentenced Wooten to a sentence higher than 87 months' and lower than 120 months' imprisonment. Wooten has now served the equivalent of about 106 months (with good time credit), and so he has served the carceral sentence that I (likely) would have imposed in 2013 (if I had had the discretion to do so).

I also find it significant that Wooten would have been released by now had the government not required his testimony in a federal grand jury investigation. The government does not rebut Wooten's argument on that point. A placement in RDAP normally lasts about nine months. *See Substance Abuse Treatment*, FED. BUREAU OF PRISONS, bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp (last visited Oct. 16, 2020). And Wooten completed over six months in RDAP between October 2018 and May 2019. *See* Wooten's Mem. of Law, Doc. No. 618-1, at 2. An inmate who successfully completes RDAP may earn up to a year off his sentence. *See* 28 C.F.R. § 550.55(a); *United States v. Handy*, 2020 WL 2487371, at *1 (D. Conn. May 14, 2020). Thus, had Wooten's participating in RDAP not been disrupted, he might have been released by July 2020 (a year before his current release date). There is every indication that Wooten would have completed RDAP successfully.

       3. Section 3553(a) factors

Before granting an inmate's motion for release pursuant to section 3582(c)(1)(A), I must ensure that the resulting sentence will be consistent with the sentencing factors as set forth in section 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A). Pursuant to section 3553(a), I must impose a sentence that is sufficient, but not greater than necessary, to (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (2) afford adequate

17

deterrence, (3) protect the public from further crimes of the defendant, and (4) provide the defendant with training, medical care, and other treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). I also must consider other factors, including the nature and circumstances of the offense and the history and characteristics of the defendant. *See id.* § 3553(a)(1).

For many of the reasons that I have already discussed, reducing Wooten's sentence to the time he has already served (about 106 months' imprisonment, including good time credit) is sufficient to serve the purposes of sentencing. A sentence of about nine years for the instant drug conspiracy offense adequately promotes respect for the law, provides just punishment, affords adequate deterrence, and protects the public from further of Wooten's crimes. As I remarked at Wooten's sentencing in 2013, a sentence close to nine years would have been appropriate in this case. Given Wooten's excellent record in prison, there is simply no reason to believe that any sentence longer than the one he has already served is necessary to comply with the purposes of sentencing. Notably, the government does not argue that the section 3553(a) factors counsel in favor of Wooten's continued detention.

Wooten's release plan gives me further confidence that Wooten will not recidivate upon his release. The PSR describes the incredibly close relationships among Wooten, Mrs. Wooten, and Wooten's sister. *See* PSR, Doc. No. 99, at ¶ 74. Wooten's desire to care for his sister and to be near his aging mother are clearly genuine. Although the government claims that "a firm plan for [Wooten's] release—whether to Ohio, Texas, or Connecticut—is not in place," the government is incorrect. *See* Gov't Renewed Opp'n, Doc. No. 622, at 2. Wooten has reassured me that he will reside at his mother's address in Akron, Ohio, "where he will provide [] much needed hands on support for his mother and sister." Wooten's Renewed Mot. for Release, Doc. No. 621, at 2; *also* BOP Progress Report, Doc. No. 618-2, at 2 (corroborating that Wooten's

proposed release address is Mrs. Wooten's address). Further, Wooten's counsel advises that a probation officer in the Northern District of Ohio has spoken with Mrs. Wooten about the arrangement and "completed a virtual inspection" of Mrs.' Wooten's residence. Wooten's 1st Supp. Mem., Doc. No. 623, at 1. Wooten conveys that "[w]ithin the coming year(s) he will petition the Court to relocate to Texas, with his mother and sister, and live with his fiancé." Wooten's Renewed Mot. for Release, Doc. No. 621, at 2; *see also* BOP Progress Report, Doc. No. 618-2, at 4.

Wooten's desire to care for his sister and to help Mrs. Wooten is the weightiest consideration contributing to the extraordinary and compelling reasons warranting Wooten's release in this case. In my view, there is no confusion regarding the fact that Wooten will be residing with Mrs. Wooten. However, in an abundance of caution, I will modify the terms of Wooten's supervised release to include the condition that he reside at Mrs. Wooten's address for the remainder of the period that he would have been incarcerated (through July 22, 2021). Doing so comports with my understanding of Wooten's request for release and with the most important reason that I grant that request.

### III. Conclusion

For the foregoing reasons, I **grant** Wooten's renewed motion for compassionate release, doc. no. 621. I reduce Wooten's sentence to time served, and he shall be immediately released from BOP custody. I **deny as moot** Wooten's supplemental motions for compassionate release, doc. nos. 623 and 624, which are supplemental memoranda in support of Wooten's renewed motion for release that were erroneously filed as motions. Because I grant Wooten's renewed motion for release, those motions (to the extent they are motions) are moot.

Upon release, Wooten shall commence serving his five-year term of supervised release consistent with the conditions that I have already imposed.  *See* Judgment, Doc. No. 147.  In addition, Wooten shall be subject to the additional condition that I have described above:  He shall reside at Mrs. Wooten's residence—738 Baird Street, Akron, Ohio 44306—for the remainder of his would-be carceral sentence (through July 22, 2021).  Wooten must contact the United States Probation Office as soon as possible, but in no event later than 72 hours after his release.

IT IS SO ORDERED.

Dated at Bridgeport, Connecticut, this 16th day of October 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge